IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:18CR741 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| KARLA JENKINS, | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, and Megan R. Miller, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States' position regarding the sentencing for Defendant Karla Jenkins. For the reasons set forth below and those to be articulated at the sentencing hearing, the United States respectfully submits that a sentence within Guidelines range set forth in the parties' Plea Agreement is appropriate in this case.

**I.    FACTUAL BACKGROUND**

To support its sentencing position, the United States offers the following summary of Defendant Jenkins's conduct. The United States also refers the Court to the description included in the PSR.

    A.    <u>Jenkins Assisted Clients in Falsifying Tax Returns</u>

The investigation in this case began when the Internal Revenue Service received a referral from its scheme development center that Jenkins, who owned and operated Vertical Tax Service LLC in South Euclid, was falsely inflating refunds for VTS clients by claiming false Schedule C business losses and Schedule A itemized deductions. Jenkins also underreported gross receipts and inflated business expenses for VTS on Schedule C of her personal tax returns. Specifically, Jenkins met with clients in her office to prepare tax returns while the client was present. She signed her clients' returns as the paid preparer and submitted the tax returns using her Preparer Tax Identification Number ("PTIN"). Jenkins charged clients between $200 and $1,000 to prepare each tax return. Jenkins processed the client's tax refunds using a refund transfer service and received a portion of the client's tax refund from the service as her tax preparation fee.

Fourteen VTS clients verified that one or more of their personal income tax returns included false information on the Schedule C, Profit or Loss from Business, and Schedule A, Itemized Deductions. During the preparation of false Schedule C forms, Jenkins fabricated business gross receipts and business expenses. VTS clients acknowledged discussing their business activities with Jenkins, but never provided information for much of the expenses or income presented on the Schedule Cs. Jenkins also fabricated Schedule A expenses for medical expenses, charitable contributions, and employee business expenses that were taken as a deduction. These fraudulent expenses falsely maximized benefits derived from federal tax withholdings and tax credits.

While investigating Jenkins, IRS special agents conducted an undercover shopping operation with Jenkins, during which Jenkins prepared a tax return for the undercover agent ("UC") containing a false Schedule C loss. The recorded conversation between Jenkins and the UC shed light on the lengths to which Jenkins went to maximize benefits and secure refunds for her clients—and thus income for her—through false business expenses.

Jenkins first explained to the UC how he could lower his total adjustable income by "invent[ing]" a business and writing off expenses from it:

> Jenkins: Okay, let me show you something.
> [*UC walks around desk to view the monitor: Jenkins points and explains:*]
> Jenkins: This is your adjustable income
> UC: Uh-huh
> Jenkins: This is your taxable income
> UC: Uh-huh . . . 42[000] . . . okay.
> Jenkins: So that's because they want more payment, your tax is 6500, it's how much they taxing you on that 42[000]
> UC: Uh-huh
> Jenkins: And they want you to make payments, well you only made payments of 63[00], meaning 63[00] is in that box. What they want is 65[00] from you.
> UC: Ah, okay
> Jenkins: So now, so here's . . . this is how you get around that. . . .
> \*\*\*
> Jenkins: Okay now. Um . . . The trick is to lower your tax. The trick is to lower your tax.
> UC: Right
> Jenkins: Your total tax.
> UC: Yeah
> Jenkins: So, you have to find deductions . . . That's why I was asking you little questions like um . . . did you drive . . . did you . . . being a telemarketer, I don't know . . . if you . . . if there's expenses that you spent . . . it's kinda hard with that job, it's going to be difficult.
> UC: Yeah
> Jenkins: I'm going to tell you right now. So this is what you're going to have to think about, 53,000, between you and I, according to my book, is taking you into a different tax bracket
> UC: Uh-huh
> Jenkins: So when you lower your um . . . adjustable income, you'll fit into a different tax bracket and then you'll get back some money. So, I can't like aide and tell you, but I can kinda ask you some questions to kinda like

3

> pick your brain, like for example, did you do anything um to make money on the side, like under the table money, or hobbies . . . like sometimes they will, well not sometimes. The government will allow you to try to invent a business or invent some type of way of making income to see if it works, and if you fail, you can just write off your expenses of that failure.

Jenkins then coached the UC to turn his dating life into a life-coaching business:

| | |
|---|---|
| Jenkins: | You don't have hobbies? You know how some people put cars and trucks and motorcycles together, stuff like that? |
| UC: | Naw, I wouldn't enjoy that. I mean my main, my main hobby is, hollin at girls but really . . . |
| Jenkins: | Is what! What you say? |
| UC: | I said it's hollin at girls is my main hobby, I can't really put that. Can I put that on there? |
| Jenkins: | Hollin at 'em? |
| UC: | Uh huh |
| Jenkins: | Naw, that's not . . . |
| UC: | Or I should say, Talking to young ladies, how's that? |
| Jenkins: | Yeah, but what do you do? Do you counsel them or something? |
| UC: | Naw . . . |
| Jenkins: | That's what they need . . . shoot! |
| UC: | A lot of them do . . . |
| Jenkins: | Right, yeah . . . Uh . . . you need uh, you need something like . . . Let me tell you what you need. It's sad, but, gotta give it to you 100 . . . |
| UC: | What's that? |
| Jenkins: | You need like a . . . you need a loss, a loss from a business or something that you do. |
| Jenkins: | You talk . . . you talk . . . What do you? . . . what do you, do you encourage them to do something better with their lives, or have you ever heard of coach, coach counseling? |
| UC: | Like a life coach or something like that? |
| Jenkins: | Yeah, yeah |
| UC: | Right |
| Jenkins: | Yeah, that's what you need to be, cause you like to talk to girls. |

Jenkins further prompted the UC to create losses from his life-coaching business, never requiring substantiation for these alleged expenses:

| | |
|---|---|
| Jenkins: | You ain't gotta tell me. So if you . . . if you bought books and stuff that's easy, that's like an easy [*garbled*] . . . books, and your gas, cause I know you got gas expenses . . . |
| UC: | Well I gotta take them out; I mean I gotta go pick them up |
| Jenkins: | Right, you gotta pick them up, take them out . . . |
| UC: | And I take them out to eat sometime |

4

| | |
|---|---|
| Jenkins: | Oh! You take them, okay . . . hold on . . . |
| UC: | Yeah, come on now, I can't be . . . |
| Jenkins: | You take them out to eat . . . if you take them out to eat, you really . . . let me give you your eating expenses |
| UC: | I can't just uh . . . Netflix and chill them all the time . . . |
| Jenkins: | Right, right you have to take them out to eat, and then what else? Um, you got business cards? No . . . |
| UC: | Uh uh |
| Jenkins: | Um, do you consult your friends? |
| UC: | Uh, do I talk to my guys about the girls? |
| Jenkins: | Yep |
| UC: | Oh yeah, I definitely talk to them about . . . |
| Jenkins: | Okay you get $400 in this uh . . . 400 I'ma give you $299 |
| UC: | Okay . . . yeah you gotta talk to the homies and . . . |
| Jenkins: | Right, and tell them how stupid they be [*garbled*] . . . Maintenance to your car? What's your maintenance like? |
| UC: | Uh, just like what do I do to my car? |
| Jenkins: | Uh hm |
| UC: | Uh |
| Jenkins: | I know you got maintenance to your vehicle . . . |
| UC: | Yeah I mean oil change, gotta keep the oil changed and tires, I probably bought some tires or something . . . I probably spent like $1000 I would think, on my car this year . . . |
| Jenkins: | You got evidence to substantiate that? |
| UC: | Uh, the car expenses? |
| Jenkins: | Uh huh |
| UC: | Yeah, somewhere, yeah . . . |
| Jenkins: | How much you say? Oh yeah . . . I kept it low . . . |
| UC: | Yeah . . . but now do I have to be able to . . . |
| Jenkins: | Show that? |
| UC: | Show the other stuff, though . . . |
| Jenkins: | Naw, the other stuff, naw, naw, that's nothing . . . |

Jenkins also explained that the UC would receive a refund and be able to pay Jenkins for her services:

| | |
|---|---|
| Jenkins: | And you're gonna pay self-employment taxes on here, but what it did was, it brought you from a 53 to a 46, so it lowered your tax bracket. |
| UC: | Uh huh |
| Jenkins: | But you'll get back a refund |
| UC: | Okay |
| Jenkins: | You'll be able to pay me, get back a refund, and your state check probably gonna go up too, which let me tell you what I did. |

5

Jenkins then assisted the UC in filling out a false Schedule C. Jenkins explained: The Schedule C "will remind me of what I did every year for you, so that I can uh . . . make sure I keep it consistent with the IRS, every year." The falsifications on the Schedule C included: (i) the fictitious life coach business; (ii) unsubstantiated deductions for cell phone bills, office expenses, meals, gas, and "contract labor"; and (iii) fake contact references ("Here's the trickiest thing, you gotta write down like three people that you contact . . . it don't have to be real people."). The fraudulent tax return generated a refund of $1,1617 whereas a correct tax return would have resulted in tax due and owing of $163.

Employing a substantially similar methodology over the course of her four-year scheme, Jenkins prepared approximately 106 false income tax returns for 61 clients. Jenkins's fraudulent activity resulted in false refund claims totaling approximately $465,515.

B.  Jenkins Falsified Her Own Tax Returns.

During this same timeframe, Jenkins also falsified her own taxes. Specifically, for the tax years 2012, 2013, and 2014, Jenkins failed to report gross receipts that she earned from her tax preparation business. She also added inflated expenses on her Schedule C; for example, in 2014, Jenkins claimed that she drove 78,000 miles for business purposes. Jenkins's falsification of her own tax returns resulted in taxes due and owing to the IRS in the approximate amount of $65,725.

II. **APPLICABLE LEGAL STANDARDS**

A well-established legal framework guides the Court's sentencing determination. The advisory Guidelines range serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006). The Guidelines thus remain an indispensable resource for assuring appropriate

6

and uniform punishment for federal criminal offenses. The Sentencing "Commission fills an important institutional role: It has the capacity courts lack to 'base its determination on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal citation omitted). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a).

### III. SENTENCING GUIDELINES COMPUTATION

The United States concurs with the Guidelines calculations set forth in the parties' Plea Agreement and the PSR. Jenkins's base offense level is 18 under U.S.S.G. § 2T4.1(G) because Jenkins caused loss between $250,000 and $550,000. A two-level enhancement applies under U.S.S.G. § 2T1.4(b)(1)(B) because Defendant was in the business of preparing tax returns. Jenkins's offense level before acceptance of responsibility is 20. Jenkins falls into Criminal History Category III. At an offense level 20 and a Criminal History Category III, Jenkins advisory Guidelines range is 41 to 51 months; if Jenkins receives a three-level reduction for acceptance of responsibility, her advisory Guidelines range is 30 to 37 months.

### IV. APPLICATION OF § 3553(a) FACTORS

#### A. NATURE AND CIRCUMSTANCES OF OFFENSE

The nature and circumstances of the offense counsel in favor of a sentence within the Guidelines range contemplated in the parties' Plea Agreement. As an initial matter, this case is not the first time that Jenkins failed to comply with tax laws. Indeed, the IRS conducted a civil audit of Jenkins's individual income tax returns was for the 2008 and 2009 tax years, which ultimately disallowed Jenkins's Schedule C and Schedule E expenses for lack of substantiation.

7

As a result, Jenkins was assessed an additional $34,204 and $24,412 of federal income tax for the 2008 and 2009 tax years, respectively.

Despite having the opportunity to change her conduct after the civil assessment, Jenkins embarked on a course of fraud spanning at least four years, during which she engaged in multiple schemes to falsely maximize benefits derived from federal tax withholdings and tax credits. Relating to her VTS clients, Jenkins added Schedule A deductions and inflated Schedule C expenses, using various methods of fraud to maximize refunds for her clients. Indeed, the undercover shopping operation demonstrates the extent to which Jenkins coached her clients to create "businesses" and corresponding "losses," straining the outer limits of even the most creative interpretation of self-employment.

Moreover, and equally significant, Jenkins also filed her own fraudulent tax returns, in which she failed to report gross receipts that she earned from her tax preparation business. In essence, then, Jenkins twice benefited from her fraud: not only did Jenkins earn more tax preparation income from her clients' inflated returns than she otherwise would have, but she also retained the benefit of this income without paying taxes on it to the IRS.

This lengthy and pervasive conduct demonstrates a disrespect for the law, which appears to have continued even after learning that she was under investigation from the IRS. Notably, the IRS executed a search warrant at VTS in March 2016. Jenkins was interviewed at that time and made several false statements to the IRS, including: that she requires clients to substantiate their business income and expenses; and that the vehicle expenses listed on her own tax returns were accurate. When confronted about these false statements, Jenkins stated: "I'm gonna get f*cked on anyways, whether I get two or three years." Incredibly, Jenkins even attempted to

8

claim losses resulting from an "unlawful raid" on her business—*i.e.* the execution of the IRS search warrant—on her 2016 tax return.

The pervasiveness of Jenkins's conduct, the length of time during which she perpetuated her fraudulent activity, and her demonstrated disregard for the law counsel in favor of a sentence within the Guidelines range set forth in the parties' Plea Agreement.

B.     HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Jenkins has a rather lengthy criminal history. As an adult, Jenkins has eleven prior convictions. While many of Jenkins's convictions are misdemeanor violations that did not receive criminal history points, taken together, these convictions demonstrate an ongoing pattern of unlawful behavior. This is all the more apparent when considered against the backdrop of the instant offense. Jenkins was on notice from the IRS regarding inadequate substantiation and inflation of Schedule C expenses after her civil assessment but nevertheless continued—and willfully escalated—her conduct. Moreover, Jenkins was on community control out of Lyndhurst Municipal Court in 2014—during the height of her fraudulent tax activity—which further suggests that previous sanctions have had little deterrent effect on her. As such, Jenkins's history and personal characteristics indicate that a sentence within the Guidelines range is appropriate.

C.     NEED FOR THE SENTENCE IMPOSED TO AFFORD ADEQUATE DETERRENCE AND PROTECT THE PUBLIC FROM FURTHER CRIMES.

Imposing a sentence within the Guidelines range would deter Jenkins and others from engaging in tax fraud. *United States v. Flores-Machicote*, 706 F.3d 16, 22 (1st Cir. 2013) ("Deterrence is widely recognized as an important factor in the sentencing calculus."); *United States v. Miller*, 484 F.3d 964, 967-68 (8th Cir. 2007) ("general deterrence . . . is one of the key purposes of sentencing"); *United States v. Jackson*, 835 F.2d 1195, 1199 (7th Cir. 1987) (Posner,

J., concurring) ("deterrence is the surest ground for punishment . . . since incapacitation may, by removing one offender from the pool of offenders, simply make a career in crime more attractive to someone else, who is balanced on the razor's edge between criminal and legitimate activity and who now faces reduced competition in the crime 'market.'").

Deterrence is particularly important in "white-collar crimes, because they are often perceived as carrying substantially lesser punishment than other comparable offenses." *United States v. Panyard*, No. 07-20037-2, 2009 WL 1099257, at *12 (E.D. Mich. April 23, 2009). As the Sixth Circuit explained in *United States v. Peppel*, 707 F.3d 627, 641 (6th Cir. 2013), "because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." Jenkins's crime was not only rational and calculated, but was multi-faceted and spanned many years. Indeed, Jenkins had numerous opportunities to cease her criminal conduct—such as when the IRS executed a search warrant at her business—but instead chose to continue her fraud. A sentence within the Guidelines range is necessary to deter Jenkins and the public from continuing to engage in tax fraud.

## V. **RESTITUTION**

Restitution to the Internal Revenue Service is directed by the Guidelines and mandated by law. U.S.S.G. § 5E1.1; 18 U.S.C. § 3663A. Thus, the United States requests that the Court order Jenkins to pay restitution in the amount of $531,240.00 to the IRS.

## VI. **CONCLUSION**

The offense conduct and other relevant factors fall within the scope of circumstances contemplated by the Guidelines, and a Guideline sentence thus will accomplish the goals of 18 U.S.C. § 3553(a). For these reasons and those to be articulated at the sentencing hearing, the

United States respectfully requests that the Court impose a term of imprisonment within the Guidelines range set forth in the parties' Plea Agreement.

                                  Respectfully submitted,

                                  JUSTIN E. HERDMAN
                                  United States Attorney

By:   /s/ Megan R. Miller
        Megan R. Miller (OH: 0085522)
        Assistant United States Attorney
        United States Court House
        801 West Superior Avenue, Suite 400
        Cleveland, OH 44113
        (216) 622-3855
        (216) 522-8355 (facsimile)
        Megan.R.Miller@usdoj.gov

CERTIFICATE OF SERVICE

    I hereby certify that on this 8th day of May 2019 a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

        /s/ Megan R. Miller
        Megan R. Miller
        Assistant U.S. Attorney